IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CV-415-RJ

| | | |
|---|---|---|
| LYNNE W. BONNER, | ) | |
| | ) | |
| Plaintiff/Claimant, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-17, -20] pursuant to Fed. R. Civ. P. 12(c). Claimant Lynne W. Bonner ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings [DE-17] is ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-20] is DENIED, and the matter is remanded for further proceedings consistent with this order.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on March 17, 2011, alleging disability beginning July 1, 2005. (R. 15, 139-70). The claim was denied initially and upon reconsideration. (R. 15, 45-70). On May 8, 2012, Claimant amended her alleged onset date to March 17, 2011. (R. 180). A hearing before the Administrative Law Judge ("ALJ") was held on January 22, 2013, at

which Claimant, represented by counsel, Claimant's husband, and a vocational expert ("VE") appeared and testified. (R. 15, 25-44). On February 1, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 12-24). On May 30, 2014, the Appeals Council denied Claimant's request for review. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling*

2

*Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

### III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920a(e)(3).

In this case, Claimant alleges the ALJ improperly evaluated Listing 2.09 and Claimant's residual functional capacity ("RFC"). Pl.'s Mem. [DE-18] at 1, 5-8.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant has not engaged in substantial gainful activity since the alleged onset date. (R. 17). Next, the ALJ determined Claimant has the severe impairment of speech impairment. However, at step three, the ALJ concluded this impairment does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform a full range of work at all exertional levels with the following limitations: avoid jobs that require verbal interaction with the public, the use of a telephone, or hazardous environments, and only close range, i.e., within 10 feet, communications with coworkers. (R. 17-19). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 18). At step four, the ALJ concluded Claimant had no past relevant work. (R. 19). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 20-21).

### B. Claimant's Testimony at the Administrative Hearing

Claimant lives with her husband and two children, eleven-year-old twins. (R. 32-33). She is a high school graduate, but school was difficult. *Id.* Claimant took special speech therapy classes, and people ridiculed her. (R. 30-31, 33). Claimant previously worked for approximately one year at Hardee's where she was in the back away from customers and as a CNA at Sunbridge. (R. 31). She left the CNA job because of her speech and people not being able to understand her questions.

4

*Id.* People generally have a hard time understanding Claimant and people who are not in her family cannot understand her. *Id.* Claimant's husband helps her to communicate with others. *Id.* Claimant has no friends outside of her family and does not got to the movies, attend church, or participate in organizations, but she does watch television and read. (R. 31-32). Claimant does the housework and cooking, and her husband pays the bills. (R. 33-34).

## C.     Claimant's Husband's Testimony at the Administrative Hearing

Claimant's husband, Welby Bonner, testified at the administrative hearing. (R. 34-36). Claimant and Mr. Bonner had been married for approximately five years at the time of hearing. (R. 35). Mr. Bonner interprets for Claimant because she cannot communicate with others, and at times he cannot understand her and has to ask her to repeat herself two or three times. *Id.* Sometimes people understand Claimant at first, but then will ask Mr. Bonner what she said, and her friends can barely understand her at all. *Id.* Mr. Bonner explained that "[a]s far as a communicational conversation, if you're asking [Claimant] questions and it was a yes or no question, you could probably understand her but if you're wanting a specific answer to a specific problem, you're going to have problems listening and understanding what she's saying." (R. 35-36).

## D.     Vocational Expert's Testimony at the Administrative Hearing

Melissa Stewart testified as a VE at the administrative hearing. (R. 36-43). After the VE's testimony regarding Claimant's past work experience as a CNA and a cook helper (R. 38), the ALJ asked the VE to assume a hypothetical individual of Claimant's age, education, and work background with no significant exertional impairments, but due to non-exertional impairments would have to avoid jobs requiring interaction verbally with the public, including answering phones or working at a desk responding to inquiries; avoid hazardous environments that would require

5

warning others in the event of difficulties; and any communication with other workers to occur within approximately 10 feet so the individual's speech would be intelligible. (R. 38-39). The ALJ inquired as to whether the hypothetical individual could perform any jobs that would be available in significant numbers in the economy. (R. 39). The VE responded that such an individual could perform the occupations of laundry labeler, Dictionary of Occupational Titles ("DOT") number 361.687-018, light, SVP of 2; light production assembler, DOT number 706.687-010, light, SVP of 2; and folder, DOT number 369.687-018, light, SVP of 2. (R. 39-40).

Claimant's counsel asked the VE whether the listed jobs require no communication, and the VE responded that less than occasional communication would be required. (R. 40-41). Counsel next asked the VE to add to the ALJ's hypothetical the limitation that the individual is "unintelligible to connect speech due to excessive hypernasality." (R. 41). The VE indicated that communication would be a challenge, but that the individual could perform the essential functions of job demands. *Id.* Counsel modified the hypothetical to include the limitation that the individual "could not be understood in her speech by persons unaccustomed to hearing her speak," and the VE responded that a person who could not be understood could not work. (R. 42-43).

## V. DISCUSSION

### A.   Listing 2.09

Claimant contends that the ALJ applied the criteria of Listing 2.09 without properly considering the required factors under Social Security Ruling 82-57. Pl.'s Mem. [DE-18] at 5-6. Specifically, Claimant argues that the ALJ mischaracterized a consultative examiner's report by failing to consider the examiner's finding that Claimant was "unintelligible in connected speech" and failing to consider the functional efficiency element of Listing 2.09. *Id.* The Commissioner

6

contends that the ALJ sufficiently considered the consultative examinations and properly evaluated Listing 2.09. Def.'s Mem. [DE-21] at 6-8. The court agrees with Claimant that the remand is necessary for further consideration of whether Claimant's speech impairment satisfies Listing 2.09.

Listing 2.09 is met where an individual demonstrates a "[l]oss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained." 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.09. Social Security Regulation 82-57 provides the framework for evaluating loss of speech for purposes of the disability determination:

> Regardless of the cause of organic loss of speech, disability occurs when the individual is unable, by any means, to produce speech which can be heard, understood, and sustained. . . . To speak effectively, an individual must be able to produce speech that can be heard, understood, and sustained well enough to permit useful communication in social and vocational settings. . . .
>
> Three attributes of speech pertinent to the evaluation of speech proficiency are: (1) audibility--the ability to speak at a level sufficient to be heard; (2) intelligibility--the ability to articulate and to link the phonetic units of speech with sufficient accuracy to be understood; and (3) functional efficiency--the ability to produce and sustain a serviceably fast rate of speech output over a useful period of time. When at least one of these attributes is missing, overall speech function is not considered effective.
>
> When a refined assessment of speech proficiency is necessary, it should be made by an otolaryngologist or a speech therapist whose evaluation should be based both on personally listening to the claimant's speech and on a history of the claimant's performance in everyday living. The findings should be sufficient to provide the reviewer with a clear picture of the individual's speech capacity. Such an analysis covering the attributes of speech discussed above would include a detailed description of the following points:
>
> 1. The intensity of speech (audibility)--the conditions under which the individual can and cannot be heard (e.g., in quiet surroundings, noisy places, a moving automobile); the maximum distance at which individuals can be heard; whether their voices tend to become inaudible, and if so, after how long;
>
> 2. The ability to articulate (intelligibility)--the frequency of any difficulties with pronunciation, the extent to which the individual is asked to repeat, how well he or she is understood by strangers unaccustomed to hearing esophageal speech; and

7

3. The rate of speech and the degree of ease with which the individual's speech flows (functional efficiency)--how long he or she is able to sustain consecutive speech; the number of words spoken without interruption or hesitancy; whether he or she appears fatigued, and if so, after how long.

S.S.R. 82-57, 1982 WL 31382, at *1-2 (Jan. 1, 1982).

At step 3 the ALJ determined Claimant's speech impairment did not satisfy Listing 2.09. (R. 17). In a cursory fashion, the ALJ explained,

> [t]he record does not show the claimant's speech impairment meets the severity of Listing 2.09, in that she does have some ability to produce speech that can be heard, understood, and sustained well enough to permit useful communication in social and vocational settings. The record shows that one independent evaluator noted that her intelligibility was fair, and the other that her intelligibility was 80 percent (Exhibits 1F, 2F).

*Id.* The ALJ relies on two consultative evaluations in support of his determination: a May 17, 2011 evaluation by Jeffrey Boyette, a speech language pathologist (R. 225-26); and a December 13, 2011 evaluation by Crystal Ipock, another speech language pathologist (R. 228). The ALJ provides a more detailed discussion of these opinions in the RFC analysis:

> In May 2011, [Claimant] underwent speech-language evaluation, with speech language pathologist, Jeffrey Boyette, MS, CCC-SLP. Testing showed the claimant's oral expression was equivalent to a 12 year old, but that her overall intelligibility was fair, with only some distortions and hypernasality. She otherwise had acceptable auditory processing, augmentative communication, vocal quality and resonance, pragmatic language, and fluency, for her age and gender. Mr. Boyette noted that the claimant did have a significant lifelong delay in overall language skills, but that she functioned well within her environment and routine (Exhibit 1F).
>
> The claimant underwent additional evaluation on December 13, 2011 with speech language pathologist Crystal Ipock, MS, CCC-SLP. Evaluation showed her oral motor ability was reduced, but adequate. She had poor resonance, low pitch, and impaired speech intelligibility due to excessive hypernasality; however, single words were intelligible. Ms. Ipock found that the claimant's overall intelligibility was 80 percent, in conversation. Ms. Ipock recommended that the claimant undergo speech therapy, and have a consultation with an ears, nose, and throat specialist, due to her hypernasality; however, it does not appear she followed through with either of these

8

recommendations (Exhibit 2F).

(R. 19).

In considering Listing 2.09, the ALJ must consider whether the Claimant's speech can be "heard, understood, or sustained." 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.09. The ALJ's decision focuses on whether Claimant's speech can be understood. The ALJ acknowledged Claimant's speech impairment, but noted Boyette's determination that Claimant's intelligibility was fair and Ipock's determination that Claimant's intelligibility was 80 percent in conversation. (R. 17, 19). However, as Claimant correctly points out, the ALJ did not address Ipock's determination that Claimant was "unintelligible in connected speech [due to] excessive hypernasality." (R. 19, 228). The Commissioner in her brief, likewise, does not address Ipock's finding that Claimant was unintelligible in connected speech. Def.'s Mem. [DE-21] at 6-8. This finding is material and potentially dispositive evidence given that S.S.R. 82-57 defines "intelligibility" in terms of "the ability to articulate and to link the phonetic units of speech with sufficient accuracy to be understood," S.S.R. 82-57, 1982 WL 31382, at *1, and, as such, the ALJ was required to address it.

Although not addressing Ipock's unintelligibility finding head on, the Commissioner does suggest that, under S.S.R. 82-57, Claimant's "steady work history since 1992" would rebut any finding, based on medical considerations, that her speech impairment meets Listing 2.09. Def.'s Mem. [DE-21] at 8. While the Commissioner is correct that under S.S.R. 82-57, work activity can rebut a finding that the severity of a claimant's impairment equals Listing 2.09, the court takes issue with the characterization of Claimant's work history as "steady." *Id.*; (R. 19). First, the ALJ determined that none of Claimant's prior work rose to the level of substantial gainful activity. (R. 19). Claimant last worked in 2008, more than four years prior to the hearing. (R. 171-79). Before

9

that time, Claimant worked at several different jobs over a period of years, in many of which earning less than $1,000.00, with her highest yearly reported income during this period being $8,921.85 in 1993. *Id.* Furthermore, the ALJ's conclusion that there is no evidence that Claimant was given any special accommodations because of her communication problems is not persuasive where the ALJ did not question Claimant at the administrative hearing on the subject of accommodations she may have received in her prior work. (R. 32-34). When Claimant was asked by her attorney why she stopped working at her job as a CNA, Claimant indicated it was due to her speech and her inability to be understood. (R. 31). Significantly, a portion of Claimant's testimony in this regard was omitted as "inaudible." (R. 31) ("I worked at Sunbridge as a CNA and I was working hard but then I - [inaudible]."). Accordingly, Claimant's prior work activity is not sufficient to rebut any finding based on medical considerations that Claimant's speech impairment meets Listing 2.09.

The Commissioner also points out that the ALJ noted that an employee at the disability office found Claimant to be barely understandable, but that she was able to complete the interview without assistance. Def.'s Mem. [DE-21] at 8. Neither the ALJ nor the Commissioner fully reported the employee's comment, and the omission is material. The SSA disability office employee who conducted Claimant's initial benefits interview indicated Claimant had a "severe speech impediment," was "barely understandable," "was able to complete the interview by herself [without] assistance," and "had written the answers on paper for the more difficult responses[.]" (R. 47). While the ALJ acknowledged that this disability office employee found Claimant to be barely understandable, he appears to have discounted her statement because Claimant was able to complete the interview by herself without assistance. (R. 19). However, the ALJ failed to note that Claimant managed to complete the interview by writing on paper the answers necessitating more difficult

10

responses. *Id.* While Claimant's ability to augment her oral communication skills with writing may be relevant in determining Claimant's RFC or whether Claimant can perform other work at step 5, it is not relevant to the determination of whether Claimant's speech impairment meets Listing 2.09, which focuses on whether Claimant's speech can be "heard, understood, or sustained." 20 C.F.R. pt. 404, subpt. P, app.1, § 2.09. The court also notes that Claimant's testimony at the administrative hearing was remarkably brief and, for the most part, consisted of single words or simple sentences. (R. 30-33). On three occasions when Claimant attempted more elaborate answers, the transcript is incomplete and contains the notation "inaudible" (R. 31-32), and the VE indicated she "couldn't quite decipher all of [Claimant's] testimony . . ." (R. 38). Accordingly, the SSA employee's observations regarding the severity of Claimant's speech impairment, bolstered by Claimant's hearing testimony, provide no support for the ALJ's finding that Claimant's speech impairment does not meet Listing 2.09.

On remand, the ALJ shall specifically address the medical finding that Claimant was "unintelligible in connected speech" (R. 228) when considering Listing 2.09 and must fully consider the listing's requirements within the framework set forth in S.S.R. 82-57. The court offers no opinion on this matter where the ALJ should have the opportunity to address this evidence in the first instance. *See Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) ("Just as it is not our province to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ], it is also not our province—nor the province of the district court—to engage in these exercises in the first instance.") (internal citation and quotation marks omitted). Where the listing analysis at step three requires remand, the court declines to address the remaining arguments.

11

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-17] is ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-20] is DENIED, and this matter is remanded for further proceedings consistent with this order.

SO ORDERED, this the 28th day of September 2015.

Robert B. Jones, Jr.
United States Magistrate Judge